## THE STATE *v.* ABRAHAM PARKER.

A party introducing a witness to impeach the testimony of another witness, is not restricted to the simple inquiry as " to the general character of the witness *for truth and veracity;*" he may inquire into the general character of the witness, whose testimony is sought to be

STATE
*v.*
PARKER.

impeached, but cannot inquire into any *particular acts* of an immoral character which may have been committed by the impeached witness.

A person accused of crime, may prove in his defence his *general good character,* and also his character as to such moral qualities as have pertinence to the charge.

APPEAL from the First District Court of New Orleans, *Larue,* J. *Isaac Johnson,* Attorney General, for the State. *Randall Hunt, J. R. Grymes,* and *J. B. Robertson,* for the appellant. The judges delivering their opinions separately. The judgment of the court was pronounced by

PRESTON, J. The accused was prosecuted for the murder of *Eliza Phillips,* was convicted of manslaughter, and has appealed from the judgment against him. He has brought the case before us, on a bill of exceptions to evidence offered and received against him, and two bills of exceptions to the rejection of evidence offered in his favor.

The district attorney offered, in evidence on the trial, the coroner's inquest; and it was admitted, the court instructing the jury, at the time, that this evidence must be restricted by them, to the proof of the death of the deceased, and that they could not regard it any further. The counsel of the prisoner excepted.

By law, the coroner, with a jury of freeholders, is directed to hold an inquest on the body of a person found dead, and the cause of whose death shall be unknown, to ascertain, by the examination of the body and of the wounds, in what manner the person has come to his death; and in order to ascertain the cause of the death, with all the certainty possible, the coroner and jury are authorized to require, at the public expense, the services of physicians, to give their opinion on the subject; and it is expressly declared, that the inquest, signed by the coroner and members of the jury, shall be sent to the clerk's office, to be a record of the facts to be used before the grand jury, in case a prosecution takes place; and, if the jury finds a person guilty of the death of the person found dead, the coroner is required to cause him to be arrested. The inquest is, therefore, a very solemn public proceeding, prescribed by law, principally for two objects: 1st, To ascertain the physical facts as to the death of the deceased. 2nd. To institute a public prosecution against the supposed perpetrator of the deed.

The direction of the statute, that the coroner's inquest is to be used as evidence before the grand jury, is not an exclusion of its use before the petty jury, because most of the evidence proper for the grand jury, is legal evidence, also, before the petty jury.

That part of the inquest which ascertains the death of a person and its precise causes, establishes mere physical facts, which are to be ascertained, according to law, for public purposes. A record of those facts made at the time, and upon inspection by a public officer and intelligent men, aided by professional skill, is better and more precise evidence of those facts, than proof from the fleeting recollections of men, or the hasty and heedless observation of passers by. Every one feels, that it is more satisfactory proof than any other that could be offered. The facts, in themselves, are evidence of neither guilt nor innocence, and have no direct tendency to implicate the accused, nor any one else. There can be no evil resulting from the admission of the record of those facts in evidence, as it can be controverted by the accused, if material to his defence, and the more conclusively, as from the time of holding the inquest, he has cognizance of them. There can be, therefore, no reasonable objection to this mode of ascertaining the physical facts, which caused the death, before the petty jury. Evidence is that which tends to convince the mind of a fact, and whatever is true and has that effect, should be received, unless rejected for some reasonable cause.

From authority, also, we should conclude, that inquests, as to matters of public and general concern, were evidence of those matters in England. 1st Greenleaf, sections 515, 556. 4 Black. Com. The ancient rules of the common law were much relaxed by statutes on this subject. McNally on Evidence, 285.

Our Constitution, however, provides that a person accused of a crime, shall have the right of meeting the witnesses face to face. Therefore, that part of the coroner's inquest, which tends to trace the death to a person accused of the deed, is not evidence on the trial, because it tends to show guilt in him, to the exclusion of others; and, therefore, he has the constitutional right of meeting the witnesses face to face. The deposition of the witnesses before the inquest, if taken in writing, should not, therefore, be given in evidence on the trial, much less should the opinion of the coroner and jury of inquest, given as the foundation of an order of arrest, that the death was caused by the accused.

The inquest, in the present case, contained the opinion that the accused fired the pistol which caused the death of the deceased, and that part of it should not have been read, or given to the jury. But as the court cautioned the jury, that no part of the inquest should have any influence upon their minds, except that which established the death, we do not feel ourselves authorized to reverse the judgment for such an irregularity, considering the caution of the court, with which it was accompanied. Men would be unfit to sit upon the trial of their fellow men for crimes, if they were incapable of discriminating, as directed by the court, between that part of the document which was evidence, and that which was not; and, if such were the case, the trial by jury would be unworthy to be regarded as the bulwark of liberty. In point of fact, jurymen are capable of making the discrimination, and there is no reason for deluding ourselves with the contrary supposition.

In the progress of the trial, the counsel of the accused took the following bill of exceptions : " Be it known, that, on the trial of this cause, the defendant offered to prove, by *H. Rowl, Mary Owens,* and other witnesses present in court, and one of whom was sworn and questioned thereto : 1st. That *Eugene Suchet,* the principal witness for the prosecution, is a man of infamous character, notoriously guilty of acting falsely and fraudulently, of extorting money, by force and cheating, from the unwary and feeble, and of living among low and abandoned women. 2d. That he is idle, dissolute and profligate; had no means of support, and no mode of obtaining money than those just set forth. 3d. That although these witnesses cannot say that he has formed any character as to a lack of truth, and is false in oaths and words, yet, from his vices and general bad character, they swear that he is unworthy of credit, and they cannot believe him on oath. To this testimony, and to the interrogatories propounded thereto, the district attorney objected ; and the judge sustained the objection, and rejected the evidence. To this ruling of the court the defendent excepted, and now tenders this his bill of exception.

*By the Court.*—The judge, in this decision, believed himself to be bound by the common law of England. He admitted all proof as to the general reputation of the witness, as to truth and veracity, but did not feel justified, under the law, in going further. J. C. LARUE, Judge."

We must take it for granted, for the purpose of this decision, that the witnesses would have given to the witness impeached, the character stated in the bill of exceptions ; and, if so, it would certainly have proved him a man of bad general reputation. The question would seem, then, to be, whether the evidence offered was as to general character, or to particular charges.

STATE
v.
PARKER.

The accused did not offer to establish any particular offence or criminal act against the witness, but that he was an infamous character; that he was addicted to crimes, which indicated a total disregard of truth, without specifying a particular crime committed by him; that he lived among low and abandoned women; that he was idle, dissolute and profligate; that he had no means of support, but what he obtained by the crimes and vices mentioned; and that, from his vices and general bad character, he was unworthy of credit, and the witnesses would not believe him on oath. These appear, to me, general descriptions of a bad character, without entering into particular facts or charges; and that the court limited the testimony, as to the general character of the impeached witness, to his character for truth and veracity alone; and that the court felt bound to such a limitation, by the rules of evidence at common law.

There is no doubt, that the tendency of many English decisions, and the opinions of some elementary writers, is to establish that limitation. Thus, Roscoe and Phillips give the very questions to be asked in impeaching a witness, limiting them to the means of knowing the general character of the witness impeached, and to the inquiry, if the witness, from that general character, would believe him on oath; and some judges have limited the questions to a knowledge of the general character of the witness, for truth and veracity. We are inclined to the opinion, however, that the weight of authority is in favor of testimony as to the general bad character, without limiting the questions as to character for truth and veracity, or establishing any formal interrogatories. Thus, Mr. Archbold, probably the most accurate elementary writer on criminal law, informs us, that the credibility of a witness is compounded, among other things, of his integrity and of his veracity, devoting a paragraph to each quality. If, therefore, his integrity tends to establish his credit, his want of integrity should go to his diesrcdit; and, in fact, this author says, the commission of all offences which import falsity or fraud, whether followed up by conviction or not, affects the credit of the witness; and he expressly says, witnesses may be examined as to the general character of the witness impeached, and does not confine their examination to the general character for truth and veracity. P. 143.

Conceding, however, such strict limitations, well established at common law, we do not feel absolutely bound by them. The act of 1805, to which, no doubt, the district judge referred, as binding him by that common law, is as follows: "The rules of evidence, and all other proceedings whatsoever, in the prosecutions of crimes, offences and misdemeanors, changing what ought to be changed, shall be according to the common law."

The ancient rules of evidence are therefore subject to change, where it is indispensable to truth and justice. We doubt if the rules of evidence in England, are precisely the same now which they were in 1805. The whole tendency of modern decisions is to relax the strict rules of evidence, with a view to lay everything before courts and juries, which ought to have an influence upon the cases before them, and to leave the objections, as much as possible, consistently with an orderly and speedy administration of justice, to the credit of the testimony and witnesses.

Now, all will agree, that a man, proved by reputable testimony to possess the character described in the bill of exceptions under consideration, would not be entitled to equal credit with a pure and virtuous witness; yet such a man, unless the proof is allowed, would stand as fair before the jury, as one of the most spotless character. And this would often occur in fact, as well as in theory. For those conversant in criminal trials, know by experience, that a wretch

selected as a witness, either to criminate or acquit by perjury, is always selected on account of his fair face, smooth tongue, and affected sincerity, for the express purpose of more effectually passing off falsehood.    The great art of such a witness, is to lie like truth ; and he is always selected from the class of men possessing the character described in the bill of exceptions.    We were therefore, in a civil case in the Western District, not reported, induced to consider favorably the views of the Supreme Court of the State of Kentucky, in the case of *Hume* v. *Scott*, 3d Marshall's R. 261, 262 ; and I will transcribe and adopt them as my views in the present case.

" Every person conversant with human nature, must be sensible of the kindred nature of the vices to which it is addicted.    So true is this, that to ascertain the existence of one vice of a particular character, is frequently to prove the existence of more at the same time in the same individual.    Add to this, that persons of infamous character may, and do frequently exist, who have formed no character as to their lack of truth, and society may have never had the opportunity of ascertaining that they are false in their words or oaths.    At the same time, they may be notoriously guilty of acting falsehood in frauds, forgeries and other crimes, as would leave no doubt of their being capable of speaking and swearing it, especially as they may frequently depose falsehood with greater security against detection, than in the practice of those vices.    In such cases, and with such characters, ought the jury to be precluded from drawing inferences unfavorable to their truth as witnesses, by excluding their general turpitude ?    By the character of every individual, that is, by the estimation in which he is held in the society or neighborhood where he is conversant, his word and his oath is estimated.    If that is free from imputation, his testimony weighs well; if it is sullied, in the same proportion his word will be doubted.    We conceive it perfectly safe, and most conducive to the purposes of justice, to trust the jury with a full knowledge of the standing of a witness into whose character an inquiry is made.    It will not thence follow, that from minor vices, they will draw the conclusion in every instance, that his oath must be discredited, but only be put upon their guard, to scrutinize his statements more strictly, while in cases of vile reputation in other respects, they would be warranted in disbelieving him, though he had never been called so often to the book, as to fix upon him the reputation of a liar when on oath."

But, in applying the principles of this decision to the case before us, I do not consider that particular acts of malconduct may be proved, or wish to be understood as holding, that the district courts must admit crimination and recrimination, further than the real purposes of justice require, and is consistent with the good order of the court and the speedy administration of justice; much must necessarily be left to the discretion of the courts of original jurisdiction, in these respects.

For these reasons, I am of opinion that the court should have admitted evidence that the witness was a man of infamous character ; that he had notoriously the character of acting falsely and fraudulently, of extorting money by force and cheating from the unwary and feeble, and of living among low and abandoned women ; that he was idle, dissolute and profligate, and supported himself by obtaining money by the means set forth ; and that from his vices and general bad character, he was unworthy of credit, and not to be believed on oath.

The accused has brought the case before us on another bill of exceptions. He introduced several witnesses to prove his character and conduct, and after show-

STATE
v.
PARKER.

ing that he was a man of good character for peace and quiet, offered to show, that he was of a mild disposition, and one of the last men who would willingly shed a woman's blood ; that he was a kind and affectionate husband and father, honest and industrious, of strict integrity and pure morals. The district attorney objected to any evidence being received as to the character of the accused, except to show that he bore a good character for peace and quietness. The court sustained the objection, and restricted the accused to these general questions : Do you know the character of the accused for peace and quietness ? Is it good or bad ? and restricted the witnesses to categorical answers thereto.

The decision is in conflict with that in the case of *The King* v. *Brecknoch,* in which the prisoner accused of murder, proved his good character, and that his witness believed he was the last man in the world who would have a thirst of blood, and was allowed, in opposition to the objection and argument of the attorney general of England, to prove particular instances to support his belief. So, in the case of a man tried for a riot, in 1780 ; he proved his good character, and the witness proceeding to give as his reason for entertaining a good opinion of him, that he knew him to be a dutiful son, and that he supported a helpless parent by his industry ; the evidence was objected to, but ruled to be proper evidence by the Chief Justice, and Gould, Justice, on the ground, that when a witness is called to support a man's character, he may not only give the prisoner a good character, but he may give his reasons for entertaining a good opinion of him. And in the capital case of *The King* v. *Thelwell,* Lord Kenyon promulgated the same principle in saying, that affectionate and warm evidences of character, when collected together, should make a strong impression in favor of a prisoner ; and when those who give such character in evidence are entitled to credit, their testimony should have great weight with the jury. McNally on Evidence, 322, 323.

It is true, that Wharton and Archbold lay down the rule, that the prisoner can give in evidence only his general character ; and Roscoe confines the inquiry as to his general character, having some analogy and reference to the charge against him. Page 72. And perhaps this is the key to the whole controversy. The nature of his general character or good acts which the accused offers to prove, should have a bearing upon the charge against him. Thus, in the prosecution of *Horn Tooke* for a libel, he was allowed to give in evidence, a book published by him twelve years before, with a view to show, that the object of his publications for which he was prosecuted, was only parliamentary reform.

At all events, I do not find the decisions in favor of admitting particular facts in evidence, as reasons of the witness for testifying to the good character of the prisoner overruled, and it appears to me so reasonable and humane, that I cannot think it inconsistent with the rules of evidence. The effort to avoid collateral issues seems, sometimes, to have excluded from the jury box, what every juryman would wish to learn, and to have trenched closely upon the principles of humanity. It is but the just reward of many good actions, that they should be of some avail to a man in his utmost need, especially when, by invoking their aid, he throws himself open to all the opprobium that can be cast upon him by the character he has acquired by his evil deeds.

I think we are justified by authority and reason too, in coming to the conclusion, that the evidence offered by the accused should have been received

The judgment of the district court is reversed, and the cause remanded for a new trial, according to law.

SLIDELL, J.  1st. Upon the first bill of exceptions, I think the ruling of the district judge was too narrow.  He confined the party impeaching the witness who had testified against him, to proof of the general reputation of the witness as to truth and veracity.  In my opinion, the prisoner should have been allowed to offer general evidence, as to the general character of the witness impeached. The State would then be allowed to inquire into the means of knowledge of the witness so testifying.  I think it proper, however, to add, that in my opinion, the district judge was right in excluding inquiry, on the part of the prisoner, as to any particular immoral conduct on the part of the impeached witness.  See the *People* v. *Mather*, 4 Wendell, 258. *Bakeman* v. *Rose*, 14 Wendell, 110. Peake, 197. 3 Hill, 178.  One very good reason for thus limiting the inquiry to general character, and not permitting it to run into particular acts and collateral facts is, that an opposite course would embarrass and delay trials to a degree that might render the administration of justice impracticable.  In adopting rules in matters of this sort, they must be considered, not in the mere abstract, but with reference to their practical working in the administration of justice.

2d. Upon the second bill of exceptions, I am of opinion, that the ruling of the district judge was too narrow.  It confined the prisoner to proof of his character for peace and quietness. I think he had a right to offer evidence as to his general character, and that in doing so, he should be permitted to show his character as to such particular moral qualities as have pertinence to the charges for which he is under trial.  See 2 Massachusetts, 317.  Roscoe, 72, &c.

EUSTIS, C. J. I concur in this opinion.

ROST, J. I concur in this opinion.