THE FORT-STREET UNION DEPOT COMPANY v. THE STATE RAILROAD CROSSING BOARD ET AL.

*Railroad companies—Jurisdiction of State Crossing Board—Manner of making crossing—Expense—Mandamus.*

1. An order made by the State Railroad Crossing Board, in a case where the board has jurisdiction of the subject-matter, cannot

be questioned, on the ground that the board exceeded its authority, by a party who consented or assented to the making of such order.

2. When railroad crossings are made over a public highway, the people become the third party in interest, and it is evidently the duty of the State Railroad Crossing Board, and of the Railroad Commissioner as well, to see that they are made with all the safeguards necessary for the protection of the public.

3. Railroad and depot companies have no *absolute* right to construct their roads upon or across the public streets. That right is derived solely from the people through the Legislature, and must be exercised in such manner, and under such restrictions, as the Legislature, acting within constitutional authority, has seen fit to impose upon them. Power must be lodged somewhere to determine when and how that right shall be exercised. Prompt action in such cases is usually necessary; and a public necessity must be found to exist in order to justify its exercise.

4. The determination of the conditions and terms upon which railroad and depot companies may obtain the use of the people's highways may, by the Legislature, be conferred upon the courts, commissioners, or public boards. When they have acted within their jurisdiction, such action is final, and then only can parties in interest be said to have acquired vested rights, such as entitle them to a judicial investigation when affected.

*Mandamus.* Submitted May 13, 1890. Denied June 6, 1890.

Relator applied for *mandamus* to vacate a portion of an order made by respondents, imposing certain conditions to right to cross street and railroad tracks. The facts are stated in the opinion.

*F. A. Baker,* for relator.

*B. W. Huston,* Attorney General, for respondents State Railroad Crossing Board and Commissioner of Railroads.

*Henry Russel,* for respondent Michigan Central Railroad Company.

GRANT, J. The relator is organized under Act No. 244, Laws of 1881, entitled—

"An act to authorize the incorporation of companies for the construction of union railroad stations and depots, with the necessary connecting tracks, and the management of the same."

In its articles of association its purpose is stated to be to acquire the necessary station grounds and construct and maintain railway, freight, and passenger depots in the city of Detroit, with the necessary railroad tracks, etc., to make suitable and proper connections with all the railroads terminating or passing through said city.

These articles were duly filed in the proper offices. The relator made a map and survey of its depot grounds and the route of its proposed tracks in the county of Wayne. Its directors indorsed the proper certificate thereon, and in October, 1889, applied to the Railroad Crossing Board for the approval of such map and survey. Notice was given to the Michigan Central Railroad Company, and the application was heard November 8, at which time an order was made by said board, approving such map and survey, and imposing certain conditions as to the super-structure on River street, and over the crossing of the Michigan Central Railroad, where its tracks cross said street. The relator insists that the crossing board exceeded its authority in imposing these conditions, and asks this Court to issue its writ commanding said board to vacate that portion of the order.

From the answers of the respondents, which, for the purposes of this hearing, must be taken as true, the following facts appear: The relator contemplated building a trestle along and over the paved portion of River street, from a point near Twelfth street to a point near Eighth street, a distance of about half a mile, thence across Seventh, Sixth, Fifth, and Fourth streets, in such a manner as to render these streets, at the points of crossing, impassible. The occupation and obstruction of River street in the manner proposed was of so much import-

ance to the city and property-owners that the board declined to approve the map until the city authorities had acted, which action was taken on the evening of the 8th. At the point of the proposed crossing, the Michigan Central Railroad Company had 13 tracks crossing River street, at such an angle as to occupy 450 feet of the street, which, between curbs, is at that point 34 feet wide on the west side, and 40 feet wide on the east side, of the tracks. Trains and engines are crossing the street almost constantly. The Michigan Central Railroad has for many years maintained a gate and watchman on each side of the crossing. Few accidents have happened, and only one since 1882. Although River street is a much-used thoroughfare, yet the business at this crossing has been so conducted that no complaint has been made against the company for obstructing the street. Its tracks at this point are not used for switching nor yard purposes, but are necessary for the movement of its cars and engines to and from its passenger and freight stations, warehouses, elevators, and slip docks.

The crossing board, after a full hearing from all parties, arrived at the following conclusions:

1. Travel at this crossing is now dangerous, and some means should be provided to secure the safety of teams and foot travelers.

2. The setting of posts or abutments along the street for the support of the relator's bridge superstructure, the superstructure itself, and the noise and smoke of passing trains over the superstructure, would largely increase the danger to teams and foot passengers.

3. Neither the board nor the Commissioner of Railroads had the power to compel the Michigan Central Company to remove any portion of its tracks from said street, nor would the danger be materially lessened if the number of tracks were reduced.

4. The only practicable method of providing for the safety of teams and foot passengers was by the means

provided by section 17 of the act providing for the appointment of a Commissioner of Railroads, and defining his powers.

5. If the map before the board was approved without conditions, there would be erected a physical obstruction that would forever prevent the erection of a bridge for the use of teams and foot passengers, because the superstructure will occupy the only space over the street where the Commissioner of Railroads can order a passage-way for the use of teams and foot travelers to be erected.

6. Unless some provision was made for the safety of teams and foot passengers, the map ought not to be approved.

The attorneys for the respective parties were then invited before the board, and the above conclusions announced to them; Mr. Baker appearing for relator, and Mr. Russel for the Michigan Central Company. The board requested them to come to some agreement which would be equitable between the companies, and in the interest of the public safety. After considerable consideration the order now complained of was formulated and written by Mr. Baker, agreed to by himself and Mr. Russel for their respective companies, assented to by the crossing board, entered upon its record, and certified as the formal and official act of the board.

On November 9, James F. Joy, one of the relator's officers, telegraphed the Deputy Commissioner of Railroads at Lansing to ask the commissioner not to indorse their order on the depot map till he should read Mr. Joy's letter relative to it. The letter was not received, but in its stead came a verbal message from Mr. Joy to the commissioner, stating that the letter had not been and would not be sent, and asking that the matter be treated as though no message had been received. The order of the board was thereupon formally promulgated, copies sent to the parties in interest, and the record signed by the members of the board. The order reads as follows:

"BEFORE THE BOARD OF RAILROAD CROSSINGS.

" *In re the approval of the map of the Fort-street Union Depot Company's proposed route in the city of Detroit.*

"DETROIT, MICHIGAN, Nov. 8, 1889.

"At a meeting of the Board of Railroad Crossings, held at the Russell House, pursuant to adjournment:

"Present, Hon. John T. Rich, Commissioner of Railroads; Hon. Gilbert R. Osmun, Secretary of State; Hon. S. V. R. Trowbridge, Attorney General,—members composing the board.

"In the matter of the application of the Fort-street Union Depot Company, for the approval of the map of its proposed line of railroad tracks between 12th and 3d streets, in the city of Detroit, county of Wayne, with a crossing of the several tracks of the Michigan Central Railroad, in Woodbridge street, near the intersection of 11th street.

"Said application now coming up for the further hearing of the board, Mr. James F. Joy and Fred A. Baker, duly appointed and authorized in such behalf, appeared as attorneys for the said the Fort-street Union Depot Company, and Mr. Ashley Pond and Henry Russel as attorneys for and in behalf of the said Michigan Central Railroad Company. Whereupon, the board having listened to the arguments of counsel, and to the statement of the engineers employed by each of the said parties in interest, respectively, and to the statements of all other parties appearing before the board, and desiring to be heard, and being otherwise fully advised and informed, and having first considered, all and singular, the premises, on motion of Mr. Osmun, seconded by Mr. Trowbridge, the said map, and the said line of railroad as designated and located thereon, were duly approved by the board, and the certificate of such approval over the proper signatures of the members of the board duly indorsed on said map.

"And it was further determined and ordered by the board with regard to the crossing of the tracks of the Michigan Central Railroad in Woodbridge street, near the intersection of 11th, that the tracks of the said Fort-street Union Depot Company shall go above those of the Michigan Central Railroad at an elevation of at least 18 feet in the clear between the upper surface of the head of the rails in the Michigan Central tracks and the

under surface of the girders in the superstructure of the said Union Depot Company's bridge; and the said superstructure shall be so constructed on River street as to provide a passage-way for teams and foot travelers, and in accordance with plans and specifications to be first submitted to and approved by the Commissioner of Railroads. The cost of the part of the superstructure for the passage of teams and foot travelers, and of the approaches thereto, shall be borne by the two companies in interest in equal proportions, share and share alike."

Before this order was issued, the Michigan Central Railroad Company agreed to permit the use of so much of its land as was found necessary for a street viaduct, in addition to that portion of the street not occupied by the relator's viaduct on the south side of the street. This necessitated, on the part of the Michigan Central Company, the abandonment of one of its freight buildings and one of its team tracks. To all these conditions this company assented, and waived all claim to damages from the relator in consequence of the erection of this superstructure over its road. On November 12 the relator filed its map and survey in the office of the register of deeds of Wayne county. It then proceeded to acquire, by purchase and condemnation proceedings in the circuit court, the property along the line of the route so adopted by it and approved by the board, using said map and order in such proceedings. After it had acquired nearly all the property required for its use, the relator, on March 25, 1890, sent a written communication to the commissioner, requesting the board to vacate, rescind, and annul that portion of the above order providing for the construction of a passage-way for teams and foot passengers, and that the cost thereof should be borne equally by the two companies. The commissioner called a meeting of the board, and all parties in interest appeared before it, and on April 29 the board denied the petition, and refused to change the order. On April 30 the

Commissioner of Railroads made the following order in regard to this crossing:

"OFFICE OF THE COMMISSIONER OF RAILROADS.

*" To the Fort-street Union Depot Company and the Michigan Central Railroad Company:*

"Whereas, in the judgment of the undersigned, Commissioner of Railroads in and for the said State of Michigan, as aforesaid, the construction of the proposed viaduct of the said Fort-street Union Depot Company along the line of River street, in the city of Detroit, in the interest of the public safety, and that of the employés on your respective roads, will necessitate the construction of an overhead passage-way for the use of teams and footmen at the crossing of the said Michigan Central tracks in said River street, near Tenth; therefore, by virtue of the authority in me vested, as Commissioner of Railroads as aforesaid, by the provisions of section 17 of Act No. 79 of the Session Laws of 1873, and the several acts amendatory thereof, it is hereby ordered and directed that in the construction of the said Fort-street Union Depot viaduct along the line of River street, as proposed by the said company, the posts or supports of the said viaduct east of the Michigan Central tracks, upon the south side of said viaduct, shall be set so as to conform in alignment with those upon the south side of the viaduct and west of the said Michigan Central tracks. There shall be constructed upon the south side of said viaduct, over the tracks of the said Michigan Central railroad, a passage-way for teams, to be not less than 24 feet in width, with the necessary approaches to the same of not exceeding four per cent. grade, and the posts or supports of the said viaduct to be so set as to afford safe and convenient access from the street, under the viaduct, to said approaches at either end of the same. There shall also be provided on the north side of said viaduct a sidewalk for the use of footmen over the tracks of the said Central Railroad, to be reached by safe and convenient stairways from either side of tracks below. And such sidewalk shall be of such width as the ordinances of the city of Detroit shall require, and shall also be provided with safe and sufficient railings to insure the safety of people against falling from said sidewalk when passing along the same. The plans for the said viaduct,

with the said passage-ways hereby ordered to be erected, will be submitted to the Commissioner of Railroads for his approval before the same shall be adopted, and the structure put in course of construction in accordance therewith.

"Given under my hand and the seal of the department at Lansing this 30th day of April, A. D. 1890.

"[Seal.]                                   JOHN T. RICH,
                    "Commissioner of Railroads."

Thereupon, the relator upon May 5 petitioned this Court for the writ of *mandamus* to compel the crossing board and the commissioner to set aside and vacate the orders of November 8 and April 30,—

"So far as the same direct or require it to join the Michigan Central Railroad Company in the construction of said overhead crossing for teams and travelers on foot, and to defray one-half of the expenses thereof."

1. No issue was framed for the taking of testimony, and the facts set up in the answers of the respondents are therefore admitted by the relator to be true. One of these facts is that the attorney for the relator assented to the order of November 8, as did also the attorney for the Michigan Central Company. He evidently reported it immediately to Mr. Joy, who was the manager for the relator, for we find him communicating the next day with the commissioner in regard to it, requesting him to withhold his indorsement till the receipt of his letter. He immediately, however, informs the commissioner that no letter will be sent, and he may proceed accordingly. He did proceed. The map was indorsed, filed, and the relator immediately proceeded to acquire the property it needed. It needs no argument to show that, if the relator agreed or assented to the order, it cannot now be heard to controvert it or deny its validity on the ground that the board exceeded its authority. The board had jurisdiction of the subject-matter. The relator acknowledged this by invoking its action. When assented to by

the two parties in interest, and made in consequence of such assent, the action of the board became in the nature of an agreement, and is conclusive and binding upon both. The respondents return that no exception was taken to the finding of the board, nor did either party in interest make any complaint as to the legal or equitable settlement of the question until the relator presented its petition of the 25th of March. The fact that the order was agreed to furnishes a sufficient reason for a denial of the writ.

2. The statute authorizes the board to disapprove of the map, or any part thereof. The board declined to approve it unless some provision should be made to insure the safety of the railroad employés and travelers by rail and over the street. To secure such protection the law provides that this board, at the time of approving said map, may determine the place where, and the manner in which, said crossing shall be made, *whether at grade or otherwise,* and if at grade, what safeguards shall be provided by the company desiring to make such crossing, to protect against accidents thereat. Whatever may be the extent of the authority of this board, it is certainly vested with a discretionary power to approve or disapprove. It determined to disapprove in this case, because of the danger to the great number of travelers over the two thoroughfares,— the street and the railroad,—a danger to which the proposed structure would very largely contribute. It so informed the relator and the Michigan Central Company, and at the same time informed them of the very humane and reasonable conditions upon which it would approve the map, viz., the construction of a viaduct for teams and foot passengers in connection with the proposed structure, each to pay half of the expense.

We can find no objection to this action of the board.
81 MICH.—17.

When these crossings are made over a public highway, the people become the third party in interest, and it is evidently the duty of this board, and the commissioner as well, to see that they are made with all the safeguards necessary for the protection of the public. Whether an arbitrary order of the character here complained of would be void as in excess of authority we are not called upon to decide. Assuming that the relator did not expressly assent or agree to the order, still it acquiesced in it for four and a half months. Its right to commence condemnation proceedings was jurisdictional upon the approval and production of the map. It has received all the benefits of the order, and now seeks to avoid all its burdens. It certainly knew that the board considered the rights and interests of the public paramount to those of relator, and that the danger to the public which would result from the adoption of the map and superstructure, as proposed, rendered disapproval imperative, in the judgment of the board. The order was not divisible at the relator's option. It could not ignore the conditions, and receive the benefits which it would not otherwise have obtained. Two courses were open to it, viz., a compliance with the order as a whole, or a prompt refusal and resort to the courts to test the validity of the action of the board. Under the circumstances, the relator, in our judgment, does not come into this Court with clean hands, asking for the issuance of a writ which is not one of strict legal right but of discretion. Its application is without equity, and its delay culpable.

3. Railroad companies and these depot companies have no absolute right to construct their roads upon or across the public streets. That right is derived solely from the people through the Legislature, and that right must be exercised in such manner, and under such restrictions, as

the Legislature, acting within constitutional authority, has seen fit to impose upon them. Power must be lodged somewhere to determine when and how that right shall be exercised. Prompt action in such cases is usually necessary. A public necessity must be found to exist in order to justify the exercise of the right. In addition to the powers conferred upon the crossing board, the statute provides:

"Whenever, in the opinion of the Commissioner of Railroads, the safety of the public would be more efficiently secured by stationing a flagman to signal trains where a highway or street is crossed by any railroad, or when one railroad crosses or intersects another railroad, or by the building of a gate or bridge at such highway, street, or railway crossing or intersection, or street railway crossing, he shall direct the corporation or corporations owning or operating any such railroad or railroads to station a flagman, or to erect and maintain a bridge or gate, at such crossing, as the public safety may demand; and, in case such flagman is directed to be stationed, or gate or bridge directed to be erected and maintained, where one railroad crosses or intersects another, *the expense thereof shall be borne jointly, in equal proportions, by the companies owning or controlling each of said railroads.*" How. Stat. § 3301.

The validity of this act is not questioned. The imperative necessity of this viaduct for teams and foot passengers is conceded, and the relator's only claim is that it is the legal duty of the Michigan Central Railroad to construct it at its sole expense. If this be so, then the statute is of no avail; for we cannot imagine a case more clearly within the juncture contemplated by the statute. The relator's counsel in his brief says:

"When such a crossing has been made at grade, the two companies are on an equality, and are equally inconvenienced; and when an overhead crossing is ordered put in, it is entirely just that each company should bear its share of the burden."

He then proceeds to argue that the only power of the commissioner is to direct the Michigan Central Company to erect the bridge. This cannot be so, in the presence of the fact found by the board and by the commissioner, and conceded by relator to be true, that this viaduct is made necessary by its proposed superstructure over the Central tracks, thereby largely increasing the danger which existed before. The duty imposed upon the crossing board and the commissioner in this case was extremely delicate and difficult. We think they acted wisely, and within the legitimate power conferred upon them.

The able counsel for relator says that the statute confers no power on the commissioner to compel a compliance with his order, and that the specific performance of his order can only be compelled by this Court in the exercise of its equity jurisdiction to issue writs of *mandamus*, or by the circuit court in the exercise of its equity jurisdiction; and this action of the commissioner deprives the relator of its right to a judicial investigation by due process of law. In support of this he cites *Railway Co. v. Minnesota*, 10 Sup. Ct. Rep. 462, 466. The conclusive reply to this position is that the relator had obtained no vested rights to entitle it to a judicial investigation within the meaning of that decision. It was endeavoring to obtain a vested right over a public street. It is only entitled to such investigation, judicial or otherwise, as the people have seen fit to grant it as a condition precedent to obtaining this vested right. The determination of the conditions and terms upon which these companies may obtain the use of the people's highways may, by the Legislature, be conferred upon the courts, commissioners, or public boards. When they have acted within their jurisdiction, their action is final, and then only can

parties in interest be said to have acquired vested rights, such as entitle them to a judicial investigation when affected. In the case cited the statute of Minnesota had attempted to confer upon a commission the exclusive power to establish schedules of freight rates. The company had already obtained the right to carry on business, and had long been doing so. The commission had fixed a rate for carrying a certain kind of freight. The court held that—

"The question of the reasonableness of a rate of charge for transportation is eminently a question for judicial investigation, requiring due process of law for its determination."

No such principle is here involved. No attempt is being made to deprive the relator of its property without due process of law.

The writ must be denied, with costs.

The other Justices concurred.