ATTORNEY GENERAL *v.* FORT STREET UNION DEPOT CO.

RAILROADS—CROSSINGS—VIADUCTS—MAINTENANCE.

> An order of the railroad commissioner, under 3 How. Stat. § 3301, requiring that a viaduct, to be erected to carry the tracks of one railroad company over those of another company, should be so constructed as to provide a passageway for pedestrians and teams, though not so expressly providing, implies a duty on the part of the companies to keep such passageway in repair.

*Mandamus* by Fred A. Maynard, attorney general, to compel the Fort Street Union Depot Company to aid in the maintenance and repair of a certain viaduct. Submitted June 20, 1898. Writ granted July 12, 1898.

*Fred A. Maynard, in pro. per.*

*Edward A. Gott* ( *Benton Hanchett*, of counsel ), for respondent.

MOORE, J. The relator asks for a writ of *mandamus* to compel the respondent to aid in the maintenance and repair of a viaduct over certain streets in the city of Detroit. The record shows that in October, 1889, the respondent presented to the railroad-crossing board a map and survey of its depot grounds and the route of its proposed tracks for approval. At this time the company contemplated building a trestle or viaduct along and over River street, in the city of Detroit, crossing the tracks of the Michigan Central Railroad, near Eleventh street. At this time the Michigan Central Company had 13 tracks crossing River street at an angle. The railroad-crossing board found this crossing was then dangerous, and that some means should be provided to secure the safety of teams and foot passengers. The board also determined

117 MICH.—39.

that the setting of posts along River street to support the viaduct superstructure, the superstructure itself, and the noise and smoke of passing trains, would increase the danger, and refused to approve of the map unless some provision was made for the safety of teams and foot travelers. After this the Union Depot Company and the Michigan Central Railroad Company appeared before the board by their attorneys, when an order was drawn by the attorney of the Union Depot Company, and agreed to by both companies, and assented to by the railroad-crossing board, which provided, among other things, for the construction of a viaduct at an elevation of at least 18 feet of clear space over the tracks of the Michigan Central, and that —

"The said superstructure shall be so constructed on River street as to provide a passageway for teams and foot travelers, and in accordance with plans and specifications to be first submitted to and approved by the commissioner of railroads. The cost of the part of the superstructure for the passage of teams and foot travelers, and of the approaches thereto, shall be borne by the two companies in interest, in equal proportions, share and share alike."

The map of the respondent at this time was approved, and was afterwards filed. Afterwards the commissioner of railroads made an order requiring the construction of an overhead passageway for the use of teams and footmen, and specifying the manner and place of its construction. The findings of the crossing board and the orders made may be found in full in *Fort St. Union Depot Co. v. State Railroad-Crossing Board*, 81 Mich. 248. The viaduct was afterwards constructed, and the cost borne share and share alike by the two companies. This viaduct was allowed to become so out of repair as to be dangerous for travel, and has been closed by the board of public works of the city of Detroit for that reason. In January, 1897, the state railroad commissioner, after a full hearing and after due notice, found the superstructure was constructed at the expense of the two companies

in the interest of public safety, and that all the conditions which led to the necessity of the construction of the viaduct still exist, and make its maintenance necessary. The commissioner made an order requiring its maintenance, at the expense of the two companies, share and share alike. The Michigan Central Railroad Company has always been, and is now, ready to pay half the cost of maintenance, but the respondent refuses to do so, basing its refusal upon two grounds:

1. Because the order requiring the construction of the viaduct did not require its maintenance.

2. Because the viaduct, when built, became a public highway, dedicated to the public, and accepted by it, and the expense of maintenance should be borne by the city of Detroit,—citing 3 How. Stat. § 3301; 3 Elliot, R. R. § 1092, and notes.

It is true the word "maintain" is not used in the orders made prior to the construction of this viaduct. It is, however, impossible for one, after reading the details of what occurred and the orders made, to conclude that any one then expected, when the viaduct was constructed, the duty of the two companies towards the passageway for teams and foot travelers would be ended, and they forever absolved from maintenance. It is a significant fact that the Michigan Central Railroad Company has never so understood the proceeding. The railroad-crossing board and the railroad commissioner found the erec-. tion of this superstructure increased the danger to teams and foot passengers on the River-street crossing. It is perfectly evident that, as long as the superstructure is continued, the danger will be continued, and, if it was necessary in the first instance to construct this passage-way, it is equally necessary it should be maintained so it shall be reasonably safe and fit for travel. The original increase in danger was caused by the necessity of this structure to enable the respondent to do business. The continued danger is caused by the continuance of this structure in the street and its use by the respondent. Common fair-

ness would imply the duty of the respondent to pay its share of maintenance.

If the railroad commissioner had, or the railroad-crossing board, under the more recent statute, should, make an order requiring a railroad company to erect gates at a street crossing, but failed to say anything about maintaining them, could it be said the railroad company had discharged its duty when it had erected its gates, and that afterwards some one else must maintain and operate them? The duty to erect such structures and appliances carries with it the duty to maintain. *People, ex rel. Attorney General,* v. *Bay County Bridge Commission,* 115 Mich. 622; *Dietrich* v. *Schremms, ante,* 298. The question of the validity of the original orders made in this case was raised and passed upon in *Fort St. Union Depot Co.* v. *State Railroad-Crossing Board,* 81 Mich. 248. It was there held the orders were valid. The statute authorizing the commissioner to make the order provides:

" Whenever, in the opinion of the commissioner of railroads, the safety of the public would be more efficiently secured by the building of a gate or bridge where a highway or street is crossed by any railroad, or where one railroad crosses or intersects another, he shall direct the corporation or corporations owning or operating any such railroad * * * to erect and maintain a bridge or gate, as the public safety may demand; and in case such * * * gate or bridge is directed to be erected and maintained where one railroad crosses or intersects another, the expense shall be borne jointly," etc. 3 How. Stat. § 3301.

Where a bridge is required under this statute by the railroad commissioner, the duty of the railroad company does not end with its construction, but its duty is continuous. It must maintain as well as construct. It is not to be presumed the legislature intended to simply provide for the safety of the public at the time the bridge or gate is ordered. It intended to provide for the safe and convenient use of the highway for all time. *Cooke* v. *Railroad Corp.,* 133 Mass. 185; *Maltby* v. *Railway Co.,* 52

Mich. 108; *Jeffrey* v. *Railroad Co.*, 108 Mich. 221 (31 L. R. A. 170). It is just as much the duty of the respondent to pay its share of maintaining this viaduct as it was to pay its share of construction.

The writ will issue as prayed.

The other Justices concurred.