[No. 3394.]

THE GERMANIA LIFE INSURANCE COMPANY v. ROSS
LEWIN.

1. EVIDENCE—VERDICT AT CORONER'S INQUEST.

The verdict of the jury at a coroner's inquest finding that the deceased committed suicide is not admissible in evidence to establish that fact as a defense to an action on a policy of insurance on the life of the deceased.

2. SAME—EXPERTS.

A regularly licensed physician of extensive practice and experience who has made a special study of toxicology, is competent to testify as an expert with reference to the effects of a noxious substance upon the human system notwithstanding he may have had no actual experience with cases of poisoning with that particular drug.

3. PRACTICE—DIRECTION OF VERDICT.

Action on a life insurance policy: Defense that the deceased committed

suicide. *Held* that, under the circumstances of the case, a direction to the jury to find for the plaintiff, was erroneous.

*Appeal from the District Court of Arapahoe County.*

THIS action was instituted by George E. Ross Lewin, as trustee, and The First National Bank of Denver, plaintiffs, against The Germania Life Insurance Company, of the city of New York, defendant, to recover upon a policy of insurance upon the life of Jacob Boehm for the sum of $30,000. This life insurance policy was procured by Boehm on the 23d day of October, 1891, the consideration being the payment of the sum of $1,644, and an agreement for a like payment annually thereafter for the period of twenty years, or during the life of the assured.

On the 11th day of November, 1891, Boehm, for a valuable consideration, assigned and transferred this policy of insurance to plaintiffs, of which assignment written notice was given to the defendant. Boehm died on the 14th day of March, 1892, at Denver, Colorado, and in due time the defendant was furnished by plaintiffs with proof of the death of the assured, and payment was demanded upon the policy, which was refused.

All these allegations of the complaint were admitted by the answer. To defeat the action, the defendant relied upon three affirmative defenses, two of which were abandoned at the trial, so that it is only necessary upon this review to consider the third defense. This third defense is based upon the fifth paragraph of the written application, which was made a part of the contract of insurance:

"Conditions and agreements of this insurance.

" This policy shall cease and be null, void and of no effect; and this Company shall not be liable for the payment of the sum assured or any part thereof; but all premiums previously paid shall be the absolute property of the Company, without any account whatever be rendered therefor: * * *

"5th. (Suicide.) If within three years from the date hereof, the said assured shall die by suicide, or by his or her

own hand, or in consequence of an attempt to commit suicide, or to take his or her own life, whether sane or insane at the time."

The company's defense of suicide was alleged in the following words:

"And the defendant further alleges that the death of said Jacob Boehm was caused by the presence of cyanide of potassium in the body of said Jacob Boehm; that cyanide of potassium is a deadly poison; that said poison was taken by the said Jacob Boehm from his own hand, and that said assured died on the day alleged by suicide, and by his own hand, and in consequence of an attempt to commit suicide, and of an attempt to take his own life."

On and prior to March 14, 1892, the deceased, Jacob Boehm, had been conducting an extensive business in the city of Denver, with one Steinbok, under the firm name of Boehm & Co. Upon that date both he and the firm were financially embarrassed, and the property of the firm was seized under a writ of attachment levied in favor of the First National Bank of Denver. The evidence shows that this attachment was levied about the noon hour, Boehm at the time being absent from the store for his noonday lunch, having gone to the Arcade restaurant, on Larimer street, in this city, with two friends, for that purpose, one, Adolph Schayer, who had been his intimate business and personal friend for many years, the other an acquaintance by the name of Farmer. Soon after these parties seated themselves at the table, and after taking some soup, the deceased, getting up from the table, stated that he desired to inform his partner, Mr. Steinbok, by telephone where he was. This he did at the telephone in the room. When he returned to his friends, it was noticed that he was pale and much agitated, and expressed a desire to leave without eating, whereupon the others said they would go with him.

On the way out of the restaurant they stopped at the cigar stand, and Boehm purchased cigars for himself and friends. About this time Boehm told Schayer that he wanted to get

rid of Farmer, in order that he might speak with Schayer on business. Boehm and Schayer then separated from Farmer, and proceeded together along Larimer street, going toward Boehm's place of business. The evidence shows that Boehm, who was laboring under great excitement, at this time, said to Schayer, "Adolph, they have got me; the sheriff is in possession of the place now," and then began muttering to himself, "My God, I didn't think George would do it!" Upon being questioned as to whom he referred, he said, "Why, the First National Bank attachment." Soon after this he stopped on the sidewalk, and said, "Adolph, I want you to promise me one thing; I want you to be as good a friend to my wife as you have been to me." Schayer testified that this conversation had such an effect upon him that he became very much excited and began to search Boehm for something; passed his hand over his hip pockets and went through his clothes, but did not find anything, but resolved to stay with him. When they reached the store of Boehm & Co., Boehm went in. Schayer remained at the entrance for a few minutes, then went to the office of Dr. Badenoff, near by, and on his way back stepped into a store for a short time. All this took but a few minutes, when he returned to Boehm's place of business and ascertained that Boehm had left during his absence. Schayer then proceeded up town; but soon returned and went to the Windsor Hotel, and looked at the register, where he saw Boehm's name registered and room No. 319 marked opposite his name. He went immediately to this room, and found the door locked on the inside. He attempted to open the door, but failing in this at first, put a boy through the transom, who opened the door by unlocking it from the inside. Upon entering the room he found the dead body of Boehm lying upon the bed, flat upon his back; his shoes had been removed from his feet; his coat off; vest unbuttoned; necktie untied, and collar loosened. The witness testifies that he found about an ounce vial in the inside vest pocket of the deceased, and he also saw a tumbler in the room, in which there was a brownish

liquid or sediment, the color corresponding with that of the liquid in the vial.

It is shown that after Mr. Schayer left Mr. Boehm, at the store, Boehm was visited by his attorney, Mr. Earl B. Coe, by appointment. The two left the store shortly after two o'clock, Mr. Coe accompanying the deceased a short distance up the street, where they separated, Mr. Coe going first to his office, and then to the residence of Mr. Boehm. Returning to his office, he was called to the Windsor Hotel, where he found Mr. Boehm a corpse. Mr. Coe testifies that from the time he left Mr. Boehm on Curtis street until he saw his body at the hotel, not more than an hour had elapsed, and possibly the time was less than this. It is shown that Mr. Boehm went to the Windsor Hotel alone, registered and asked for a room to lie down in. He had never had a room at this hotel before.

It is further shown that soon after Mr. Schayer entered the room at the hotel, Dr. Martin reached the place, and made an examination of the body. At this time the deceased's head was thrown back at an angle of 45 degrees; his mouth was open; his eyes partially open; his body still warm; his finger-nails were bluish in color. The vial found in the deceased's pocket was labelled " Sol. Cyanide of Potassium," with the name of Neil Dahl as the druggist printed thereon. A glass or tumbler was found on the stand, containing about half a teaspoonful of the liquid, which the doctor pronounced cyanide of potassium. He smelled the contents of both the tumbler and the bottle, and pronounced the solution in the glass the same as that in the bottle. Mr. Schayer tasted and smelled the contents of the glass, and said that it was like bitter almonds. It was also in evidence that cyanide of potassium tastes bitter, and has an odor of bitter almonds. Another witness, Mr. Levy, a druggist, examined the contents of the bottle and glass, and described such contents as having an odor " like bitter almonds or Prussic acid."

The evidence tends to show that cyanide of potassium,

placed upon the tongue or lips, will give them a brownish hue, and that the lips and tongue of the deceased were of such a hue.   There were some stains upon the lips which are described as similar to that which would be produced from drinking from a glass.   There were a few drops on the chin, which had, also, discolored the skin.   It is in evidence that cyanide of potassium, with syrup of lemon, will discolor the skin, making it a brownish hue.

It is also in evidence that on the 10th day of March, 1892, Mr. Boehm procured a bottle of cyanide of potassium from Dr. Muir, his family physician; that such liquid was at the time colorless; that cyanide of potassium is a deadly poison, with the effects of which Mr. Boehm was familiar.   It is also shown that the prescription given by Dr. Muir to Mr. Boehm contained syrup of lemon, and there is some evidence tending to show that this compound will take on a brownish hue with the lapse of time.

Shortly after the discovery of Mr. Boehm's body it was visited by Mr. Rollins, the undertaker.   Mr. Rollins appeared in answer to a message for the coroner, who was out, Rollins and the coroner occupying offices together.   Mr. Rollins caused the body to be removed to his undertaking establishment.   He says that he examined the contents of the vial, and that the odor was the same as the odor of preparations used by them in cleaning silverware, which preparation was cyanide of potassium.   He further testifies that the odor of cyanide of potassium is peculiar and unmistakable.

Dr. Muir examined the body within twenty-four hours from the time of death, but it had been removed to the undertaking establishment then.   He says he smelled the lips and detected a garlicky odor, like cyanide of potassium.

The defendant, assuming the burden of proof, offered much evidence, only a part of which was admitted.   When it rested, the court directed a verdict for the plaintiffs, and rendered judgment in accordance with such verdict when returned. To reverse this judgment, the cause is brought here by appeal.

Messrs. WILLIAMS & WHITFORD, Mr. HUGH BUTLER and Mr. C. S. WILSON, for appellants.

Messrs. JEROME & HOOD and Mr. C. J. HUGHS, Jr., for appellees.

CHIEF JUSTICE HAYT delivered the opinion of the court.

In reviewing the action of the district court in directing a verdict and rendering judgment for plaintiff, we are not only to consider the evidence actually received, but, also, such competent evidence as was offered and rejected. In support of the issue as to the alleged suicide of the deceased, the defendant offered in evidence the duly certified verdict of the coroner's jury. When this offer was first made, the trial judge seemed to have been of the opinion that such inquisitions were in no case admissible. After argument of counsel, the court changed its opinion in this respect, but rejected the inquisition upon the ground that it was impeached for irregularity in the proceeding by the evidence of Col. Chivington, the coroner.

Upon this rehearing, we are of the opinion that the first impression of the trial court was correct, and that the inquisition was not admissible for the purpose of proving suicide. This view, which is in opposition to the conclusion announced upon the former hearing, is based primarily upon a more careful examination of our statutes.

For instance, with us the coroner is made a conservator of the peace, and in case of information reaching him of the violent or sudden death of any person within his jurisdiction, the cause of which is unknown, he is required to proceed and view the body and make proper inquiry in respect to the cause and manner of death, and when such death occurs under suspicious circumstances, he is forthwith to summon a jury of six persons, citizens of the county, to appear and hold an inquest. In case the jury finds that a crime has been committed, and names the person whom the jury believes has

committed the same, it is the duty of the coroner to issue a warrant to arrest such person, and take him forthwith before a justice of the peace, and when the person charged is brought before the justice of the peace, he "shall be dealt with as a person held under a criminal complaint in the usual form," such warrant being a sufficient foundation for the proceeding before a justice, the same as an ordinary complaint under oath. Such being the substance of the statutes, we conclude that the purpose of inquisitions of this character is merely to furnish the foundation for a criminal prosecution in case the death is shown to be felonious.

It is claimed that inquisitions by coroners were admissible in evidence at common law, and hence, are now admissible in jurisdictions where the common law rule has not been changed by statutes, and the following cases are cited in support of this contention: *U. S. Life Ins. Co. v. Vocke*, 129 Ill. 557; *Pyle v. Pyle*, 158 Ill. 289; *Walther v. Mutual Life Ins. Co. of N. Y.*, 65 Cal. 417.

The English rule, however, grew out of the fact that the inquisition was a judicial proceeding, authorized by statute, and made the source of title of the king for lands escheating to the government; and hence, were analogous to proceedings *in rem*, but this reason is without force under our system of government. Moreover, under our constitution, as originally adopted, no part of the judicial power of the state could be vested in the coroner. It is true that this constitution was amended in 1885 so as to permit the legislature to create new courts, conferring upon that body a large discretion with reference to the jurisdiction that might be given to such courts, but no attempt has since been made to confer judicial power upon coroners in this state; hence, the inquest sought to be introduced in this case was extra judicially taken, and should have been excluded under the rule laid down by Prof. Greenleaf. 1 Greenleaf's Evidence, sec. 556.

It is true that a contrary conclusion has been reached in the state of Illinois, under statutes quite similar to our own,

but those cases were decided since the statutes were adopted here, and for this reason the rule does not prevail, that in adopting a statute of a sister state, we take it with the construction theretofore put upon it by the courts of that state. For this reason, the Illinois decisions are persuasive merely, and not controlling.

The case of *Walther v. Mutual Life Ins. Co.*, 65 Cal. 417, is hardly an authority in favor of the inquisition in this case, as in that case the plaintiff in an action upon a life insurance policy himself introduced in evidence the record of the proceeding of a coroner's jury. This record was introduced for the purpose of showing that the party had complied with the requirements of the policy as to the preliminary proofs of death, but it also showed the verdict of the coroner's jury, which was, in effect, that the insured had committed suicide, and the court held that the whole admission must be taken together, and when so taken, were *prima facie* evidence of the facts stated therein, including the statement with reference to the suicide of the deceased. It does not necessarily follow, from the decision of the court, or anything said in that opinion or in the opinion in *Insurance Company v. Newton*, 22 Wall. 32, and upon which the California decision is based, that the inquisition would have been admitted in evidence to prove suicide if seasonable objection had been made thereto.

In case of death under suspicious circumstances, or resulting from accident, the rule permitting inquisitions to be used in evidence would result in a race and scramble to secure a favorable coroner's verdict, that would influence, and, perhaps, control in case suit should be instituted against life insurance companies upon policies of insurance, and in cases of accidents occurring as the result of negligence on the part of corporations operating railways, street car lines, mining for coal or the precious metals, etc. Law writers, of late, have frequently animadverted upon the carelessness with which such inquests are frequently conducted, and to allow inquisitions to be used in a suit between private parties upon

a cause of action growing out of the death of the deceased, as in this case, would be to introduce an element of uncertainty into the practice which, we think, would be contrary to public policy, and pernicious in the extreme ; and for these reasons we conclude, upon careful consideration, that the safer and better rule is to exclude such inquisitions. *State v. Co. Com. of Cecil Co.*, 54 Md. 426 ; *Goldschmidt et al. v. Mutual Life Ins. Co. of N. Y.*, 102 N. Y. 486.

The appellant introduced Dr. Eskridge as an expert witness, for the purpose, among other things, of proving by him the symptoms attending a case of poisoning by cyanide of potassium.   Dr. Eskridge testified that he graduated from Jefferson Medical College, of Philadelphia, about nineteen years before, and that he has been regularly and constantly engaged in the practice of his profession since that time ; that he was duly licensed to practice medicine under the laws of Colorado ; that toxicology was a part of the medical instruction received at college, and that he had made this branch of his profession a special study for twelve or thirteen years ; that he had been a lecturer and teacher in toxicology for four or five years; that he was familiar with all the authorities and had them at the time in his library ; that while he had had no experience in treating a case of poisoning from cyanide of potassium he had, in his experience, treated many other cases extending over a large field ; that he had had nearly one hundred cases of suicide or homicide from poisoning ; that he had had, probably, eighteen cases of arsenical poisoning ; some fifteen cases of opium poisoning ; cases of poisoning by belladonna; by carbolic acid; one case of nitric acid poisoning; one case of *veratria de veri* poisoning; two cases of aconite poisoning, and one of bichloride of mercury, or corrosive sublimate, poisoning.

Notwithstanding the extended study and experience of Dr. Eskridge, and his admitted learning, the court refused to receive his testimony with reference to the effects of cyanide of potassium upon the human system, for the reason that he had had no actual experience with poisoning from cyanide

of potassium. In this ruling we think the court was clearly in error. It is seldom that a witness is presented whose general competency, not only in the practice of medicine, but in toxicology, is so well established as was that of Dr. Eskridge upon the trial; and the court erred in allowing the fact that he had never attended a patient suffering from poisoning by cyanide of potassium to outweigh all other evidence of competency. New poisons are constantly being discovered by scientists, and under the rule announced by the district court, all inquiry as to the result of such new poisons upon the human system from experts, would be excluded. In fact, under the rule announced expert evidence would be excluded in all except those cases in which some of the usual and well-known poisons were resorted to. We think this rule would offer a premium to the ingenuity of criminals and others in the selection of rare and unusual poisons to destroy human life. It is entirely too technical, and not supported by reason or authority. The evidence shows that cyanide of potassium acts almost instantaneously, and that if sufficient is administered, death follows immediately; hence, the chance of finding a physician qualified to testify under the rule announced by the district court is slight, indeed.

In some states it has been held that the decision of the trial court upon the competency of a witness to testify as an expert is conclusive; but we think the contrary rule is supported by the weight of reason and authority. It has the sanction of the Supreme Court of the United States, and should be followed in order that the practice in the state and national courts may be similar. In the case of *Stillwell & Bierce Mfg. Co. v. Phelps*, 130 U. S. 520, this rule is stated as follows: "Whether a witness called to testify to any matter of opinion, has such qualifications and knowledge as to make his testimony admissible, is a preliminary question for the judge presiding at the trial; and his decision is conclusive unless clearly shown to be erroneous in matter of law." In the case at bar we think it is clear that the district judge erred as to the law. The evidence of Dr. Esk-

ridge and experts similarly qualified should have been admitted.

We are of the opinion that the evidence properly admitted, and that which was offered and erroneously refused, was sufficient to entitle the defendant to have the defense of suicide submitted to the jury; and although such plea, to prevail, must be established by clear and satisfactory evidence, it may, nevertheless, be so established by circumstantial evidence. In this case we think it is clear that the court erred in directing a judgment for the plaintiff. The judgment will, therefore, be reversed, and the cause remanded.

*Reversed.*

MR. JUSTICE CAMPBELL concurring specially.

Because of the error of the district court in directing a verdict for the defendant, I join with my brethren in voting for a reversal of the judgment. As at present advised, I am unable to agree with them in holding the verdict of the coroner's jury inadmissible in evidence for any purpose. The better doctrine, in my opinion, and the one sustained by the weight of authority in England and in this country, as announced by the supreme court of Illinois in the cases cited in the foregoing opinion, is that such a verdict, being a judicial determination of a fact of public interest and importance, required by the statute thus to be ascertained, is competent and admissible in a case like the one at bar, as *prima facie* evidence of the cause of death, as therein found. To the same effect are: 2 Phillips's Evidence, *262–268; 1 Greenleaf's Evidence, sec. 556; 1 Starkie's Evidence, *307–309; *Walthers v. M. L. I. Co.*, 65 Cal. 417; *County of Lancaster v. Mishler*, 100 Pa. St. 624. In Louisiana it seems to be admissible even in a criminal case. *State v. Parker*, 7 La. Ann. 83; *State v. Duffy*, 39 La. Ann. 419. The New York case I do not think militates against this doctrine, while the case from Maryland is clearly *dictum*, for the question as to the

effect of the admissibility of the verdict of the coroner's jury was not present in the case.

I do not give to section 1 of article 6 of our constitution (as originally adopted) the same effect that my brethren do. It reads as follows:

" The judicial power of the state, as to matters of law and equity, *except as in this constitution otherwise provided*, shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts as may be·created by law for cities and incorporated towns."

The exception therein embodied indicates that elsewhere in the constitution judicial power may have been " otherwise provided." Turning to section 8 of article 14, there is found a mandate that there shall be elected in every county, every two years, one coroner. His duties are not therein defined, but the coroner was a well known officer at the common law, and unquestionably exercised judicial power in holding inquests. Without any further specification in the constitution, unless the statute imposed limitations, the office would therefore exist with all common law incidents. 4 Am. & Eng. Ency. of Law, 173, and cases cited.

That the general assembly so interpreted said section 8 as authorizing the creation of a coroner's court and the vesting of judicial power therein, is shown in that, at its first session in 1877, it passed an act, largely declaratory of the common law, whereby it clothed the coroner with certain powers, some of which are only ministerial, but others as clearly judicial in their nature as those vested by section 1 of article 6 in the supreme or district courts. Nor do I conceive the sole object of an inquisition by a coroner to be to lay a foundation for a criminal prosecution, in case the finding is that the death was felonious. That, it is true, is one object, but by section 870 Mill's Ann. Stats.: " Where he has notice of the dead body of any person supposed to have died by unlawful means, *or the cause of whose death is unknown*, found or being in the county, it shall be his duty to summon forthwith, six citizens of the county to appear at a time and place

named." He thereupon holds an inquest to ascertain the
cause of death.

In the majority opinion the interpretation of the statute is
as if the words above italicized were omitted, and the effect
of such decision is to divest the coroner of power to hold an
inquest to ascertain the cause of death when, as he supposes,
it was not unlawful, but *only unknown.* I know of no rule
that justifies such construction.    As I interpret this statute,
it is made the duty of the coroner, when he receives notice
of a dead body, where the cause of death is unknown, forth-
with to summon a jury, subpoena witnesses, and cause a
judicial investigation to be made to ascertain that cause.
If found to be unknown, the verdict so embodying it, which
must be filed in the district court of the proper county, is a
judicial determination of a fact required to be determined by
the statute; and as such, should be considered as *prima facie*
evidence of that fact, at least in all civil cases wherein it
becomes material.    Moreover, that the powers conferred
upon the coroner by this act are judicial, and his tribunal a
court, though of inferior jurisdiction in some of the states in
this country, seems scarcely debatable.    See authorities al-
ready cited; also 4 Am. & Eng. Ency. of Law, 174 *et seq.* and
cases cited; Black's Law Dict. 274, 278; Anderson's Law
Dict. 260; Vickers on Coroners; 5 Enc. Pl. & Pr. 38 *et seq.*;
*Boisliniere v. Co. Comm.,* 32 Mo. 375.    He is authorized to
impanel a jury, to supervise and control the inquest, to sub-
pœna witnesses and enforce their attendance, to punish them
and jurors for contempt in disobeying his process, the same
as can a justice of the peace when his process runs in behalf
of the state.    He may also issue a warrant, running in the
name of the people of the state, for the apprehension of a
person suspected, in case the death is found to be felonious.
So that this verdict, being at common law admissible as afore-
said, and that system of law being in force here so far as
applicable and of a general nature, and unless modified by
statute, I think the same rule is in force in this state.

I am not unaware of the claim made as to the origin of the

rule in England, and of the deduction therefrom, that the reason of the rule ceasing, the rule itself should fail. But the common law, as we have adopted it, placed no such limitation upon the rule as is applied by the majority. Neither do I fail to perceive the force of the argument of the learned Chief Justice, wherein, if the rule contended for by me is enforced, he anticipates an unseemly scramble of interested persons to influence the coroner's verdict. But these and similar arguments are more properly addressed to the legislative department, as reasons for changing a long recognized common law rule, and should not be potential with courts as a reason why they should encroach upon legislative functions.