SOVEREIGN CAMP OF WOODMEN OF THE WORLD V. HONORA
GRANDON.

FILED FEBRUARY 19, 1902.    No. 10,864.

Commissioner's opinion, Department No. 3.

1. **Insurance:** MUTUAL BENEFIT: DELINQUENT MEMBER: REINSTATE-
MENT: DEPOSITING LETTER IN MAIL. The constitution of a
mutual benefit association provided that a member suspended
for the non-payment of dues and assessments might be rein-
stated by personally applying therefor and paying to the clerk
of his camp all arrearages, and, if in good health, his reinstate-
ment should take place and his certificate again become valid
as soon as payment had been received and recorded by the clerk.
If the delinquent member does not appear in person to pay his
arrearages, he shall then send to the clerk a written statement
on an official form to be furnished by the association, to the
effect that he is in good health, as a condition precedent to re-
instatement, and waiving all rights thereto if his written state-
ment shall be found to be untrue. *Held,* That a suspended mem-
ber signing the written statement provided for in the above
rule, and depositing the same in a letter-box, enclosed in an
envelope stamped and addressed to the clerk of the camp, had
sufficiently complied with the requirements of the constitution
above quoted, although the statement did not reach the clerk
until after the death of the suspended member.

2. **Physician.** A physician may testify that he was called to attend
a patient, and to the number and dates of his professional
visits, as these facts are not privileged under section 333 of the
Code of Civil Procedure.

3. ———: WAIVER OF PRIVILEGE: CROSS-EXAMINATION. In a suit be-
tween the representative of a deceased person and an insurance
company, the physician who attended the deceased in his last
illness was called by the defendant, and testified to the fact of
having attended the deceased, and to the time when first called,
and some other matters relating thereto, but was not allowed
to testify as to the condition of the deceased or the ailment
from which he was suffering. The physician, at the request of
the plaintiff, had given her a written statement to the effect
that the deceased was not seriously sick until the evening
previous to his death, and on his cross-examination the physi-
cian admitted making the statement, and the same was offered
and admitted in evidence as a part of his cross-examination.
*Held,* That this constituted a waiver of her privilege on the
part of the plaintiff, and that the defendant should have been
permitted to re-examine the physician as to the condition of his
patient.

4. **Record: BOARD OF HEALTH: PRIVILEGED CHARACTER.** A record kept under the ordinances of a city for the evident purpose of assisting the board of health in the conduct of the affairs of that office, is not such a public record as to be entitled to admission in evidence to show the truth of the matters therein recited, and especially should it be rejected as evidence when offered to establish a fact which would not be admissible against a party because of its privileged character.

ERROR from the district court for Douglas county. Tried below before POWELL, J. *Reversed.*

*Brome & Burnett,* for plaintiff in error.

*Timothy J. Mahoney* and *J. A. C. Kennedy, contra.*

DUFFIE, C.

The plaintiff in error is a mutual benefit association doing a life insurance business in Douglas county, Nebraska, and elsewhere throughout the United States. On June 18, 1894, Thomas Grandon, the husband of the defendant in error, became a member of Alpha Camp, No. 1; and the plaintiff in error issued to said Thomas Grandon its beneficiary certificate, by the terms of which it agreed, in consideration of certain payments made and to be made, to pay the defendant in error the sum of $2,000 at the death of said Thomas Grandon. Grandon died May 6, 1897, and it is alleged in the petition filed in the district court that at the date of his death he was still a member of said fraternity, in good standing, and the holder of said beneficiary certificate, and died without having in anywise changed the appointee therein. It is further alleged that due notice and proof of the death of said Grandon was furnished to the defendant, but that defendant has wholly failed, refused and neglected to pay the plaintiff the amount due her under said certificate. The answer of the defendant admits that it is a mutual benefit association, and that Grandon became a member of said association in June, 1894, being a member of Alpha Camp, No. 1, located at Omaha, Nebraska; admits that it issued to Thomas Grandon its beneficiary certificate, and alleges

that it was provided by the terms of said certificate that if Grandon, at the time of his death, should be in good standing as a member of this fraternity, then and in that event it would pay the plaintiff below the sum of $2,000 at the death of said Grandon. The answer admits the death of Grandon and proof of such death. As a defense to the action, it is alleged that Grandon had failed to comply with the constitution and laws adopted by defendant governing said order and its members; that section 108 of the constitution of the order provided as follows: "On or about the 20th day of each month, the sovereign commander and chairman of the sovereign finance committee shall determine the number of assessments, if any, necessary to provide for the payment of deaths which may be registered for payment and shall so notify the sovereign clerk. In beneficiary head camp jurisdictions, this shall be determined in such manner as its laws may provide"; that section 109 of the constitution is as follows: "Every member of this order, unless otherwise notified by the clerk of his camp, in the manner herein provided, shall pay to the said clerk every month, one assessment in the beneficiary fund, together with one monthly payment of the sovereign camp or beneficiary head camp general fund dues and camp dues, as levied, also any additional assessments for beneficiary fund or special general fund dues, which may have been ordered by the sovereign camp or beneficiary head camp, as the case may be; and if he fails to pay either on or before the first day of the month following, he shall stand suspended, and during such suspension his beneficiary certificate shall be void." The answer further alleges that at the time Grandon became a member, and at all times since, the constitution and laws of the defendant contained the following provision: "Should a suspended member personally appear and apply for reinstatement within three months from the date of his suspension and pay all arrearages, if in good health. he shall be restored to membership and his beneficiary certificate again become valid as soon as said payment

shall have been received and recorded by the clerk of his camp. If a delinquent member does not appear in person to pay his arrearages, he shall send to the clerk a written statement on the official form, furnished by the sovereign camp or beneficiary head camp, to the effect that he is in good health as a condition precedent to reinstatement and waiving all rights thereto if his said written statement shall be found untrue. If the representations and statements made in said written statement be untrue, then said payments shall not cause his reinstatement." It is further alleged that Thomas Grandon was not, at the time of his death, a member of said fraternity in good standing, for the following reasons: That the amount of each assessment to be paid by said Grandon was the sum of $1.45; that the amount of camp dues to be paid by him was 30 cents monthly. It is alleged that he failed to pay assessment No. 70 for $1.45, as well, also, as camp dues for the month of February, 1897, and that by reason of said default and non-payment, his beneficiary certificate became wholly null and void. It is further alleged that assessment No. 71 was duly made by the sovereign commander and chairman of the finance committee on March 20, 1897, for the payment of deaths registered, and April 20, 1897, assessments Nos. 72 and 73 were duly made; that up to May 5, 1897, Grandon had failed to pay assessments 70, 71, 72 and 73, which amount, in the aggregate, to the sum of $5.80; that he also had failed to pay his camp dues up to May 1, 1897, which amount, in the aggregate, to the sum of $1.20, and that he had been suspended for such non-payment from and after March 1, 1897. It is further alleged in the answer that on May 5, 1897, the daughter of Thomas Grandon called at the office of the clerk of Alpha Camp, and ascertained the amount necessary to reinstate him, and paid the amount; that the clerk informed her at the time that, Grandon not having called in person and paid the amount, it was necessary for him to send a certificate, as provided by the constitution and laws of the order; that he gave her a blank certificate in the

official form furnished by the sovereign camp, which was to be filled out and signed by said Grandon, and which certificate contained a statement that said Grandon was in good health, as a condition precedent to reinstatement, and waiving all rights thereto if his said written statement shall be found untrue; that on the next day, to wit, May 6, 1897, said certificate, signed by said Thomas Grandon by the making of his mark thereon, was received by the clerk through the United States mail, but that Grandon had died on said day, previous to the receipt of said certificate by the clerk. It is further alleged that Thomas Grandon was not in good health at the time of signing said certificate, and that by reason of the foregoing facts he had never been reinstated in the order, and that the defendant was not liable for the amount of his certificate. A trial of the case resulted in a verdict for the plaintiff below, on which judgment was entered, and the record is brought to this court for review.

One of the controversies between the parties is the meaning of the word "send" found in the following clause of the constitution of the order: "If a delinquent member does not appear in person to pay his arrearages, he shall send to the clerk a written statement on the official form, furnished by the sovereign camp or beneficiary head camp, to the effect that he is in good health as a condition precedent to reinstatement, and waiving all rights thereto if his said written statement shall be found to be untrue. If the representations and statements made in said written statement be untrue, then said payments shall not cause his reinstatement." It will be borne in mind that Grandon was delinquent in the payment of four assessments and three instalments of monthly dues to his camp. On the afternoon of May 5, 1897, the daughter of Grandon called on Allen, the clerk of Alpha Camp, and paid him the amount of such delinquent dues and assessments. Allen informed her that one in default who did not appear in person to pay his dues must send his written statement, on the official form furnished by the sovereign camp, that

he is in good health, as a condition precedent to his rein-statement, and waiving all rights thereto if his statement shall be found to be untrue. On the evening of the same day, Grandon signed a certificate as required, and the same was deposited in one of the mailing boxes in the city of Omaha, but was not received at the post-office until 11 A. M. of the 6th of May, and did not reach the hands of the clerk until some time in the afternoon of May 6th, and after the death of Grandon. Plaintiff in error insists that mailing the certificate was not sending it to the clerk of the camp, or that, if it was, it can not be considered as sent until it actually reached the clerk, and that reinstate-ment should date from the time the certificate reached the clerk, and not from the time of depositing it in the mail. The constitution provides that the certificate must be "sent," not that it shall be received, as a condition prece-dent to reinstatement.

Much of the ordinary business of the company, must, in the nature of things, have been transacted through the mail, and it is not unfair to presume that this provision of the constitution was intended for the benefit of mem-bers who resided at a distance from the camp, and who, as a matter of convenience, if not necessity, were com-pelled to use the mails instead of a messenger. There is nothing in the constitution stating in what manner this certificate shall be sent, and the clerk in this case directed that it should be sent by mail, and furnished a stamped envelope for that purpose. This is evidence of the con-struction put upon the constitution by the officers of the order, and we are agreed that the depositing of this certifi-cate in the mail was a compliance with the rules of the order. This holding is supported by *Jackson v. Northwest-ern Mutual Relief Ass'n*, 47 N. W. Rep. [Wis.], 733.

On the trial of the case, the defendant below called Dr. Malster as a witness, and he testified that he was a physi-cian, and that he had been called to attend Grandon in his last illness. He gave some evidence as to the time when called, and the number of calls made; but, because

of objections made by the plaintiff below, he was not allowed to testify as to Grandon's condition. The plaintiff below, as a part of her cross-examination, exhibits a written statement, signed by the doctor, in the following form: "Omaha, August 19, 1897. This is to certify that I treated T. Grandon in his last sickness, and that he was not dangerously sick until the night before he died." This statement she introduced in evidence as a part of the doctor's cross-examination. The company then sought to examine the doctor further, claiming that by the introduction of this statement the plaintiff had waived her privileges, and that it was entitled to show by the witness the condition of Grandon, and of what illness he was suffering. The court refused to allow this examination to be made, and this holding of the court is one of the errors assigned and argued. We do not know upon what theory the district court refused this examination, but it was probably upon the theory advanced by the plaintiff below in her brief here, and, that her position may be fully understood, we quote from the brief: "The plaintiff in error called Dr. Malster to show that he had treated Thomas Grandon. The only possible object of this testimony was to show, by inference, from the fact of treatment that Grandon was not in good health. The defendant in error then offered the doctor's written statement as cross-examination. There was no objection that it was not cross-examination. It was offered as such and received as such without objection. It was not offered as part of the plaintiff's case, and therefore no waiver can be inferred from it. If the defendant below could put the doctor on the stand and draw out testimony tending to show that Grandon was not in good health and the plaintiff could not then cross-examine so as to weaken that evidence without thereby waiving the privilege, the statutory privilege is of no avail." Our statute relating to witnesses and their competency contains the following provision relating to professional communications: "No practicing attorney, counsellor, physician, surgeon, minister of the gospel, or priest of any

denomination shall be allowed, in giving testimony, to disclose any confidential communication, properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline." Code of Civil Procedure, sec. 333. "The prohibitions in the preceding sections do not apply to cases where the party in whose favor the respective provisions are enacted waives the rights thereby conferred." Code of Civil Procedure, sec. 334. The rule in this state, as well as in other states having a like statute, is that the above sections protect a party against any disclosure by a physician made to him in the course of his professional employment, and necessary and proper to enable him to discharge his duty to his patient. Not only are such communications privileged, but whatever knowledge the physician may gain from observing his condition and symptoms is likewise privileged. There can be no doubt as to the rights of the patient in this respect, and the courts, in a proper case, are vigilant to see that these rights are fully protected. But the fact that a physician was called to attend a patient is not a privileged communication. The supreme court of Michigan, in construing a similar statute, said: "The fact that a doctor is the family physician of the insured, and the fact that he attended the insured professionally, and the dates and number of his visits, are each and all facts which are not within the prohibition of the statute, and to which the physician may be permitted to testify." *Briesenmeister v. Knights of Pythias*, 81 Mich., 525. In *Cooley v. Foltz*, 85 Mich., 47, we find the following statement: "Plaintiff introduced one physician known as an 'eclectic,' and who had never graduated at any regular school of medicine, who testified to her injuries. The defendant then introduced two physicians as witnesses who had been called to treat her both before and after the alleged trouble with the defendant. They obtained no knowledge of her ailments and condition except what they had obtained in their professional capacity. This testi-

mony was objected to as inadmissible under How. Stat., 7516. The objection was well taken, and the testimony should have been excluded. *Briesenmeister v. Supreme Lodge,* 81 Mich., 525, and authorities there cited. The entire subject is there fully discussed, rendering further mention here unnecessary. The defendant evidently recognizes the error, as he has filed no brief in this court. In the event of a new trial it is proper to say that it was competent for the defense to introduce these witnesses, and prove by them that they had been called by the plaintiff to examine and prescribe for her. The failure of the plaintiff to produce them as witnesses was a legitimate fact for the jury in determining the merits of the case." The plaintiff in error had a right to call Doctor Malster to show by him that he had waited upon Grandon in his professional capacity. No privilege was violated in so doing, and the defendant in error, by introducing the written statement of the doctor that Grandon was not seriously sick until the evening previous to his death, opened up the question of his condition, and thereby waived the privilege which the statute gave her. In *Morris v. Railway Co.,* 148 N. Y., 88, it is said in effect that statutory prohibition can not be used both as a shield and a sword. If a party to the suit of his own volition in any manner or form places before the jury the evidence of the physician as to what he observed or what was said to him, he can not longer object on the ground that the knowledge furnishing the basis of such confidence was obtained while treating the patient in a professional capacity. We have no doubt that it was error on the part of the court to refuse to allow the plaintiff in error to further examine the doctor as to the physical condition of Grandon at the time referred to in his written statement, and that this is of such materiality as to require a reversal of the case.

There is but one question requiring further consideration. An ordinance of the city of Omaha makes it the duty of every undertaker or other person, before removing any corpse for burial, to obtain from the secretary of the

board of health a permit to do so, and, before obtaining such permit, he shall deposit with said secretary a certificate setting forth, among other matters, the cause and date of death, and duration of last illness of deceased, which certificate shall be signed by the physician or surgeon in attendance at the time of death. In case no physician or surgeon attended the deceased, then the certificate must be made by some relative or attendant. It will be observed that it is only by implication that the ordinance above referred to requires the physician to make and sign the certificate contemplated by the ordinance. The certificate, when made, is not required to be under oath, and its purpose is evidently to assist the health department in the performance of the duties devolving upon that office. It is a mere police regulation, and is not intended for the purpose of supplying the public at large with information upon which reliance may be placed in the business affairs of the community. We do not think the record is of such character as to entitle it to be received in evidence, as affecting the interest of a party to a litigation. There is another reason, which, in our opinion, makes it incompetent. If signed by a physician, it contains matter relating to his patient which the physician is not allowed to disclose as a witness upon the trial against the objection of his patient or those representing him. That a record of this character, reciting privileged communications, may be used in evidence against a party where the testimony of the physician making it could not be received, is a proposition so inconsistent with reason and natural rules of justice that we can not give our consent thereto. The court properly refused to allow the certificate in evidence.

Because of the error of the court in refusing a further examination of Doctor Malster, we recommend a reversal of the judgment.

AMES and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

REVERSED.

NOTE.—*Privileged Communications.—Physician and Patient.*—At common law, the protection accorded to professional communications was not extended to physicians and surgeons. Taylor, 481. In recognition of the necessity for a full confidence between physician and patient, the legislatures of the following states and territories have extended the privilege to communications between physician and patient: Arizona, Arkansas, California, Colorado, Idaho, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Utah, Washington, Wisconsin and Wyoming. The restrictive clause of the several states varies considerably. I believe ' that New York was the first state to pass such a law.' The New York statute reads: "A person duly authorized to practice physic or surgery shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity." Code of Civil Procedure, par. 834. The restrictive clause that physician or surgeon "shall not be allowed to disclose," etc., has been substantially copied by Iowa, Michigan, Pennsylvania and Nebraska. In Nebraska the physician and surgeon are placed in the same category with the attorney, minister and priest. Code of Civil Procedure, sec. 333. The New York statute will not protect communications of a confidential nature made to one not legally qualified to practice, even against the protest of his patient. *Wiel v. Cowles*, 45 Hun [N. Y.], 307. Hence one dealing with another purporting to be a physician and surgeon, is charged with knowledge of his disability. The several statutes of California, Colorado, Idaho, Minnesota, Nevada, North Dakota, Oregon, Utah and Washington, provide that the physician either *shall not* or *can not* be examined. The statute of Montana that he *shall not be a witness.* The statute of Ohio that he *shall not testify;* and this restriction has been copied by Wyoming. The statutes of Indiana, Kansas and Missouri provide that a physician shall not be competent to testify to information professionally obtained, and this provision has been substantially copied in Oklahoma. The statutes of Arkansas, North Carolina and Wisconsin provide the physician shall not be required, or compelled, to testify. Arkansas extends this protection to the "trained nurse," while North Carolina, by a proviso, leaves the matter in the hands of the presiding judge. The statutes of California, Idaho, Minnesota, Montana, Oregon, Pennsylvania, Utah and Washington expressly restrict the application to civil cases. The statutes of Kansas, Nebraska, Nevada, Ohio, Oklahoma and Wyoming provide that the patient may waive the privilege and allow the witness to testify. As the privilege by these statutes

8

is for the benefit of the patient, it is not impossible that courts might hold, as they have held in regard to attorneys, that this, like any personal privilege, might be waived in the absence of a statute. The mere fact that one is a licensed physician, does not, *ipso facto,* confer the privilege. The confidential relation must exist at the time the information is obtained. *Jacobs v. Cross,* 19 Minn., 523. The relation must not be presumed; it must be proved. *People v. Schuyler,* 106 N. Y., 298, 12 N. E. Rep., 783. It is not necessary to the existence of the relation that the patient himself summon the physician; the legal effect is the same if he be summoned by the attending physician, by the friends of the patient or by strangers. *Renihan v. Dennin,* 103 N. Y., 573. Where the public prosecutor sends a physician to examine a person upon whom a crime has been committed, for the purpose of obtaining evidence, and he treats the sufferer, the relation attaches and the physician is disqualified as a witness. *People v. Murphy,* 101 N. Y., 126. The same is true of a physician sent on a like errand by the defendant, in a suit for personal injuries. *Weitz v. Mound City R. Co.,* 53 Mo. App., 39; *Freel v. Market Street R. Co.,* 97 Cal., 40. It is otherwise when he visits the patient only for the purpose of information. *Nesbit v. People,* 19 Colo., 441, 36 Pac. Rep., 221; *People v. Kemmler,* 119 N. Y., 580. (The latter is the celebrated electrocution case.) The information which a physician is forbidden to disclose, is not confined to communications made by the patient. But the restriction applies to all facts which necessarily come to a physician in a professional case. *People v. Stout,* 3 Parker's Rep. [N. Y.], 670. This question has never been passed upon by the supreme court of Nebraska. But in the eighth judicial district of this state, at the November, 1897, term of district court for Cedar county, Evans, J., presiding, the case of *Rawhouser v. Aukeny* (bastardy) was tried, when the defendant offered as a witness one Augustus Hamilton, who, after qualifying as a physician, and testifying that he had been consulted by the prosecutrix and had made an examination, was asked what was the result of the examination with reference to her being pregnant. The question was objected to as calling for the result of a professional consultation and examination. The objection was sustained. The ruling was not assigned as error on review before the supreme court. To the same effect is *Kelley v. Highfield,* 15 Ore., 277; and in Indiana whose statute, like our own, uses the word "communication," the supreme court "sets the seal of real secrecy and confidence upon what the physician observes in respect to the patient's person." *Williams v. Johnson,* 112 Ind., 273. There are certain communications outside professional privilege. *Collins v. Mack,* 31 Ark., 684. There is some disagreement amongst authorities as to whether a physician can testify with reference to his patient being drunk or sober. *Linz v. Massachusetts Mutual Life Ins. Co.,* 8 Mo. App., 363; *Kling v. City of Kansas,* 27 Mo. App., 231. The former case allows of the physician so testifying; the latter forbids him to so testify. The rule of exclusion applies to testamentary capacity. *Renihan v. Dennin,* 103 N. Y., 573. Communications for the purpose of doing an unlawful act or committing a crime are not privileged.

*People v. Lane*, 101 Cal., 513, 36 Pac. Rep., 16; *State v. Kidd*, 89 Ia., 54; *State v. Smith*, 99 Ia., 26, 68 N. W. Rep., 428. A physician is not precluded from giving the number and dates of his professional visits. *Briesenmeister v. Knights of Pythias*, 81 Mich., 252; *Dittrich v. City of Detroit*, 98 Mich., 245, 57 N. W. Rep., 125. A physician took an unprofessional friend with him to attend a case of confinement. The doctor was sick and fatigued from overwork. The roads were so bad that a horse could neither be ridden nor driven over them. His nonprofessional friend reluctantly consented to go with him and assist in carrying the lantern, umbrella and obstetrical instruments. It was in midwinter. The house was 14x16 and had but one room. During the accouchement, the doctor's companion conducted himself with great propriety, sitting with his face to the wall; and only once when the patient, in a labor-pain, had kicked a female assistant in the pit of the stomach, was he called to assist. He held one of her hands, but returned to his former position when the agony was past. The doctor did not disclose the non-professional character of his companion. The woman recovered in an action on the case against both the doctor and his companion for "shame and mortification," by this violation of professional confidence. *De May v. Roberts*, 46 Mich., 160-166.—REPORTER.