**UNITED STATES v. JOHNSON et ux.**

No. 9862.

Circuit Court of Appeals, Eighth Circuit.

Sept. 13, 1934.

Frederick H. Wagener, Atty., Department of Justice, of Lincoln, Neb. (Charles E. Sandall, U. S. Atty., and Ambrose C. Epperson, Asst. U. S. Atty., both of Omaha, Neb., Robert Van Pelt, Asst. U. S. Atty. of Lincoln, Neb., and Fred G. Hawxby, Asst. U. S. Atty., of Omaha, Neb., on the brief), for the United States.

Carl T. Self of Omaha, Neb. (J. J. Gallagher, of Omaha, Neb., on the brief), for appellees.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellees are the parents of Clarence R. Johnson, deceased, and the joint beneficiaries in a war risk insurance policy in the sum of $10,000, granted to the insured while in service. Deceased enlisted in the Navy of the United States November 16, 1917, and was honorably discharged therefrom September 31, 1919. He died April 8, 1920, aged a little more than twenty-six years.

September 4, 1930, appellees presented to the United States Veterans' Bureau and Veterans' Administration of the United States a claim for payment of the insurance covered by the policy. This claim was rejected July 29, 1931. On or about August 10, 1931, appellees filed this suit in the District Court of the United States for the District of Nebraska, alleging: "That the said insured received total and permanent injuries and disabilities while in the said service of the defendant as aforesaid and contracted mental and physical disease by reason of which he was unable to carry on a gainful occupation and of such a character that finally resulted in his death on or about April 8th, 1920 as result of deranged mental condition contracted while in the said service, and that said disabilities and disease was incurred during the said service of the insured in the said United States Navy and during the time that the said policy of insurance was in full effect and force and that the said policy matured at the time of the said injuries and discharge of the said insured at which time the insured was totally and permanently disabled as contemplated by law."

The answer, alleging that the policy of insurance lapsed for the nonpayment of the premium due December 1, 1919, denied liability thereunder. A jury trial resulted in a verdict for appellees, from which the government appeals. The issue in suit is thus clear-

ly and succinctly stated by the trial court in its charge: "The mother and father bringing this suit upon this contract of insurance claim that the deceased, Clarence Robert Johnson, did become totally and permanently disabled, within the meaning of the contract, at or before said 31st day of December, 1919, and, as explained by their testimony in this case, their claim is that he became the victim of and had dementia praecox of such a character as to totally disable him and of such a character as to permanently disable him."

"Dementia praecox" is defined by the medical witnesses as a specific form of insanity; that is to say, a mental disease that usually comes on about the period of adolescence, made up of peculiar behavior, and resulting in a progressive mental deterioration, permanent and incurable. To warrant recovery it was necessary for appellees to prove that this mental state existed while the policy was still in force, that it was permanent and irremediable, and that its presence made it impossible for the insured to follow continuously any substantially gainful occupation within the established rule. To sustain the burden, thus imposed by law, appellees introduced witnesses testifying that deceased had spent three years as a student at the University of Nebraska, and a year at a business college thereafter in the city of Omaha; that he was ambitious, and cheerful in disposition, much attached to the study of music, and somewhat skilled in the use of musical instruments; that he was of a social nature and interested in life generally. A number of witnesses, including his parents, testified to a marked change in him in these respects upon his return from service. He complained of not feeling well, of headaches, was discontented, nervous, restless, and dissatisfied. He was less inclined to social intercourse, less interested in affairs generally, and apparently took no interest in music, to which he had formerly been greatly attached. He displayed no ambition nor desire to get something to do, nor to decide upon any future line of business or employment. At his father's suggestion he took employment in a clothing store about March 1, 1920, and remained there until April 5, 1920. Patrons of the store in which he worked saw nothing noticeably unusual in his appearance. He left without notice to any one and was found dead in Chicago shortly thereafter. A number of his acquaintances, witnesses for the defense, testified that they noticed that he was somewhat nervous and restless after his return from service, but did not observe anything unusual or odd

about him otherwise. The witness Johnson, himself an ex-service man, testified as follows: "During the times I saw him after the War, I wouldn't say I noticed anything unusual about him or anything out of the ordinary. He might have been a little fidgety or nervous, you might say. I saw him walking down the street. I wouldn't say there was anything unusual about his walk. I never observed anything unusual about Clarence Johnson's mentality, only it seemed like he wasn't just satisfied to stay one place and another and would be up and down the street, and he wouldn't stay very long in any one place. I don't have any explanation for that, unless he was just dissatisfied around there; probably after coming out of the service would be the only thing. It didn't seem the same after coming out of the service if you were gone any length of time. I believe that condition applied to all men in the service a little more or less."

Apparently the alleged peculiarities and changes to which reference has been made were deemed scarcely sufficient to establish a mental condition of the seriousness pleaded; and reliance was placed upon the claim of suicide as the cause of death, and as a significant result of the progressive mental disease with which he was claimed to be afflicted. At this critical stage of the testimony the following took place in the course of examination of J. M. Johnson, the father:

"Q. (by counsel for plaintiffs): Did you make any investigation then after you got there (Chicago), Mr. Johnson, as to the cause of his death? A. Why yes.

"Q. What did you discover from your investigation was the cause of his death?

"Objected to as not the best evidence, no foundation laid and hearsay.

"The Court: Are you without witnesses to show the manner of his death?

"Mr. Self (for plaintiffs): There was nobody there. The only thing we can show at this time is the photostatic copy of the coroner's jury which we took from the government's records, signed by the jury themselves, showing the cause of death.

"The Court: I will admit that in the evidence.

"To which ruling of the court the defendant then and there duly excepted."

Plaintiffs then offered in evidence Exhibit 6, being the said photostatic copy of the proceedings of the coroner's court relating to the findings as to the death of Clarence Robert Johnson. Counsel for defendant then ob-

jected to the introduction of this exhibit. The objection was overruled and an exception was preserved. Later on counsel for plaintiffs offered in evidence a photostatic copy of the death certificate filed with the Bureau of Vital Statistics of the Chicago Department of Public Health, stating "we want to introduce this only to show the cause of death in Chicago and the date." The certificate was received in evidence by the court over the seasonable objection and exception of appellant, and contained the following statement: "The cause of death was as follows: From asphyxiation due to inhaling illuminating gas with suicidal intent while temporarily insane."

The report of the coroner's inquest contained the testimony of witnesses examined in which it was repeatedly stated that, in their opinion, the deceased committed suicide. In their attempt to prove that the insured was suffering from dementia praecox, and was, therefore, totally and permanently disabled from following continuously any gainful pursuit while the policy of insurance was in force, counsel for appellees propounded hypothetical questions to three medical witnesses. The questions in each case were identical. After reciting at length the conduct of the deceased, both before and after service as deduced by counsel from the testimony on this point, the following language was included: "That without notifying his employer, his father or mother or anyone else, he disappeared from Wayne and went to Chicago, Illinois and secured a room in a rooming house at 502 Rush Street in Chicago, and after packing the doors and cracks up he turned on the gas jet and without removing his clothing, except his shoes, and inhaled gas taking his own life; that he left no grip, no papers of identification, and it appeared as though he had torn the identification tag from the inside coat pocket and left nothing to show his name or identification."

These alleged facts as to what took place in Chicago appeared only from the report of the coroner's inquest. To these hypothetical questions the following objection was made: "The defendant objects for the reason that the hypothetical question assumes facts not in evidence, omits material facts which are in evidence and is not a fair reflection of the facts in evidence and draws conclusions from the evidence which are not warranted, and no sufficient foundation laid, and as incompetent, irrelevant and immaterial and calling for a conclusion of the witness."

The objections were overruled and exceptions preserved. The medical witnesses to whom these hypothetical questions were addressed laid much stress upon this assumed culminating act of suicide as confirming their conclusion that deceased was suffering from dementia praecox from the time of his discharge, as well as upon his conduct and the manner of his death in Chicago, as gleaned from the report of the coroner and the contents of the death certificate. The court in its charge, otherwise unexceptionable, told the jury that "there is proof here, or some testimony here, tending to show suicide on the part of the deceased." To this statement counsel for defendant duly excepted. There was in the record no testimony tending to show suicide, or the cause and manner of death except that contained in the coroner's report and the certificate of death, and it is obvious that the accepted fact of suicide, thus conceived to be established, carried great weight with the jurors in arriving at their verdict. Error is assigned to the admission of these documents, to the hypothetical questions based in part thereon, and to the charge of the court to which reference has been made. Other errors are assigned, but we think this appeal can be disposed of without a more detailed discussion of such.

In our opinion the documents in question were incompetent to prove the cause and manner of death in a civil suit of this nature, and the objections to their admission in evidence should have been sustained. An examination of the decisions leads inescapably to this conclusion.

"In action against government on policy of war risk insurance, admission of coroner's certificate for purpose of showing cause of death held erroneous and prejudicial, since such certificates are not competent evidence as to cause of death as between private litigants, especially where certificate was not authenticated under state statute or 28 USCA § 688." In the body of the opinion this reason is given: "Such certificates are not competent evdence as to the cause of death, as between private litigants, for the reasons stated by the Supreme Court of the state (Washington) in Sullivan v. Seattle Elec. Co., 51 Wash. 71, 97 P. 1109, 130 Am. St. Rep. 1082. The ruling was prejudicial, because a jury would naturally attribute the early indisposition of the deceased to the malady which eventually caused his death some years later." United States v. Blackburn (C. C. A. 9) 33 F.(2d) 564, 565.

The Washington case referred to held as follows: "The record of a coroner's report

of an inquest is not competent evidence in civil actions of the cause of the death."

After citing a great array of cases to show that the great weight of authority is against the admission of such reports and certificates in civil actions, the Supreme Court of Washington, as the reasons for excluding this class of testimony, quotes approvingly from the opinion in Germania Life Ins. Co. v. Ross-Lewin, 24 Colo. 43, 51 P. 488, 491, 65 Am. St. Rep. 215: "In case of death under suspicious circumstances, or resulting from accident, the rule permitting inquisitions to be used in evidence would result in a race and scramble to secure a favorable coroner's verdict that would influence, and perhaps control, in case suit should be instituted against life insurance companies upon policies of insurance, and in cases of accidents occurring as the result of negligence on the part of corporations operating railways, street-car lines, mining for coal or the precious metals, etc. Law writers of late have frequently animadverted upon the carelessness with which such inquests are frequently conducted, and to allow inquisitions to be used in a suit between private parties upon a cause of action growing out of the death of the deceased, as in this case, would be to introduce an element of uncertainty into the practice, which, we think, would be contrary to public policy, and pernicious in the extreme; and for these reasons we conclude, upon careful consideration, that the safer and better rule is to exclude such inquisitions."

Reference is also made to Sovereign Camp of W. O. W. v. Grandon, 64 Neb. 39, 89 N. W. 448, which will be considered later. Section 688, 28 USCA refers to records and exemplification of books which may be kept in any public office of any state or territory, or of any country subject to the jurisdiction of the United States, not appertaining to a court. Appellees, however, rely upon section 661, 28 USCA, which provides thus: *"Copies of department records and papers; admissibility.* Copies of any books, records, papers, or documents in any of the executive departments authenticated under the seals of such departments, respectively, shall be admitted in evidence equally with the originals thereof."

It is clear from the language of this section that it applies only to the books and documents having to do with the official records of departments. This is the view of the Circuit Court of Appeals for the Fifth Circuit in Sprencel v. United States, 47 F.(2d) 501, 507, in which we fully concur. Compare United States v. Cole (C. C. A. 6) 45 F.(2d) 339, 341. The rule does not apply to documents or papers incidentally lodged in an executive department, and forming no part of the official records required to be kept under governing statutes and regulations. But even if it were to be conceded that the authentication of such papers and documents is permissible and regular, the question of their competency in a civil action between private litigants still remains. In United States v. Harrison (C. C. A. 4) 49 F.(2d) 227, the court, approving the decision in United States v. Blackburn, supra, held that an undertaker's death certificate is inadmissible in an action on a war risk insurance policy. The rule, excluding death certificates and reports of coroner's inquests offered to prove the cause of death, prevails in state as well as federal jurisdictions, Hollister v. Cordero, 76 Cal. 649, 18 P. 855; Rowe v. Such, 134 Cal. 573, 66 P. 862, 67 P. 760; Germania Life Ins. Co. v. Ross-Lewin, 24 Colo. 43, 51 P. 488, 65 Am. St. Rep. 215; State v. Cecil County Commissioners, 54 Md. 426; Wasey v. Insurance Co., 126 Mich. 119, 85 N. W. 459; Bishop v. Shurly, 237 Mich. 76, 211 N. W. 75; Cox v. Royal Tribe, 42 Or. 365, 71 P. 73, 60 L. R. A. 620, 95 Am. St. Rep. 752; Davis v. Supreme Lodge, K. of H., 165 N. Y. 159, 58 N. E. 891, and particularly is this true in Nebraska, the state in which this controversy arose. The case was tried in a federal court in and for the district of Nebraska.

In Sovereign Camp of W. O. W. v. Grandon, 64 Neb. 39, 89 N. W. 448, it was held that: "A record kept under the ordinances of a city for the evident purpose of assisting the board of health in the conduct of the affairs of that office is not such a public record as to be entitled to admission in evidence to show the truth of the matters therein recited." And, again, loc. cit. page 48 of 64 Neb., 89 N. W. 448, 451: "It is a mere police regulation, and is not intended for the purpose of supplying the public at large with information upon which reliance may be placed in the business affairs of the community. We do not think the record is of such character as to entitle it to be received in evidence, as affecting the interest of a party to a litigation."

In Omaha & C. B. Street R. Co. v. Johnson, 109 Neb. 526, 191 N. W. 691, the court held that a medical certificate of death, made out in the manner prescribed by statute, "is incompetent when offered as proof of the cause of death as shown by the recitals contained therein." The court said further: "Such a certificate, however, though filed pub-

licly with the registrar, is not a public record entitled to be introduced as independent evidence in such a case as this. It is filled out by the attending physician in an ex parte manner, without a hearing and without the right of parties interested to cross-examine. In a controversy between individuals, where the cause of death is a material issue, such certificate has no direct evidentiary value on that issue, and its recitals must be disregarded by this court."

In Ocean Accident & Guarantee Corporation, Ltd., v. Schachner (C. C. A. 7) 70 F. (2d) 28, 32, we find: "A coroner's verdict does not constitute evidence of any fact or finding therein stated, and is not admissible as such."

For the error in admitting in evidence the contents of the coroner's report, and the certificate of death, the judgment below must be reversed and the case remanded for a new trial in which appellees may have opportunity, if possible, to sustain, by competent testimony, their right to recover in this action. It is so ordered.